THE STATE EX REL. GENERAL ELECTRIC CORPORATION, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLEE; ROSS, APPELLANT.

[Cite as *State ex rel. Gen. Elec. Corp. v. Indus. Comm.,* **103 Ohio St.3d 420, 2004-Ohio-5585.**]

(No. 2004–0299—Submitted August 17, 2004—Decided November 3, 2004.)

**Per Curiam.**

{¶ 1} In 1996, appellant-claimant, Randall D. Ross, received an electrical shock at work. The accident caused cataracts, and claimant's vision decreased to 20/200 from what was presumed to have been 20/20. He eventually required bilateral surgery and corneal lens implants, which corrected his vision.

{¶ 2} In 2001, claimant moved appellee Industrial Commission of Ohio for a scheduled-loss award under R.C. 4123.57(B) for a total loss of vision in both eyes. The commission granted that award:

{¶ 3} "Following the industrial injury the claimant developed cataracts and the claimant's vision deteriorated to 20/200. Dr. Kode considered this level of visual acuity to be legally blind.

{¶ 4} "Subsequently, the claimant had cataract surgery and intraocular lens implants for his eyes—the right eye surgery was completed on 12–4–00 and the left eye surgery was completed on 2–1–01.

{¶ 5} "The Staff Hearing Officer finds that claimant is entitled to a total loss of vision for his left and right eye, as the claimant had no impairment prior to the injury and 20/200 vision after the injury.

{¶ 6} "The Staff Hearing Officer finds that the improvement in the claimant's eyesight following the 12–00 and 2–01 surgeries is no more than a correction to vision and as such is not to be taken into consideration in determining the percentage of vision actually lost.

{¶ 7} "In coming to this conclusion the Staff Hearing Officer relies on Ohio Revised Code 4123.57[B] [and] *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229 [31 OBR 436, 510 N.E.2d 356] * * *."

{¶ 8} Appellee-employer General Electric Corporation initiated an action in mandamus in the Court of Appeals for Franklin County, alleging a commission abuse of discretion. Analysis centered on *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356, and the debate over correction versus restoration. In 1987, *Kroger* held that, based on "the current state of the medical art," a claimant's corneal transplant was only corrective, not restorative, and could not be considered in making an award. Id., paragraph two of the syllabus. Here, the court of appeals ruled that—16 years later—medical procedure had evolved to the point where claimant's surgery could be considered restorative, and therefore the court foreclosed an award.

{¶ 9} This cause is now before this court on an appeal as of right.

{¶ 10} After an eye injury, repair frequently consists of one or more of the following: (1) the natural healing process, (2) a transplant, (3) an artificial implant that the patient cannot remove, or (4) a temporary prosthetic device to aid vision. See *Creative Dimensions Group, Inc. v. Hill* (1993), 16 Va.App. 439, 444, 430 S.E.2d 718.

{¶ 11} When these measures fail to ameliorate the loss of sight incurred—be it full or partial—no one questions the claimant's right to a scheduled-loss award. Debate often vigorously ensues, however, when improvement is achieved.

{¶ 12} Ohio, like most states, makes uncorrected vision the standard for evaluation. This standard may have arisen when, in many trades, glasses could not be accommodated. *Jewell Collieries Corp. v. Kenda* (1942), 110 Colo. 394, 395, 134 P.2d 206. Something like this situation may continue today in work settings where smoke, chemicals, dust, or other irritants make wearing contact lenses impossible.

{¶ 13} R.C. 4123.57(B) delineates how partial disability should be compensated:

{¶ 14} "For the loss of the sight of an eye, one hundred twenty-five weeks.

{¶ 15} "For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. 'Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease."

{¶ 16} The statute bars the commission from considering a correction to vision either in making an award or in assessing an amount. This law continually vexes employers who cannot reconcile the concept of loss with a claimant whose postinjury vision has been improved to 20/20. Most jurisdictions, however, have recognized this view as short-sighted, with the utility of glasses and contact lenses best refuting what may seem, at first glance, to be unassailable logic:

{¶ 17} "[L]oss having occurred, it continues unless there is recovery. The condition will not improve; it is permanent. Correction by artificial appliance does not effect a recovery. Recovery and correction are not the same. The lenses and glasses are not instruments to improve or cure. They are beneficial only when in place and are subject to being lost, broken or becoming ill-fitted or ineffective. On the happening of any such event, the loss returns, if it can be said that it ever went away. Corrective lenses are just that, corrective." *Natl. Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Lucio* (Tex.App.1984), 674 S.W.2d 487, 488.

{¶ 18} The difficult distinction between recovery/restoration and correction remains the cornerstone of scheduled-loss-of-vision litigation. Although these terms are statutorily undefined, case law returns to two criteria again and again: visual improvement and permanence.

{¶ 19} Recognizing the miracle that is the eye, we note that the first prerequisite encompasses more than just enhancement of distance vision. In *Kalhorn v. Bellevue* (1988), 227 Neb. 880, 420 N.W.2d 713, for example, an intraocular lens implant raised claimant's postinjury visual acuity from 20/200 to 20/40. That improvement, however, was held insufficient to establish restoration. The Nebraska Supreme Court declared:

{¶ 20} "The evidence shows that unlike a human lens, the [claimant's implanted] plastic lens is monofocused, meaning that it focuses only at one distance. A human lens has the capability of changing its focus. The human lens differs from a plastic lens because the human lens has some ability to filter out light. The implant does not have any filtering powers. Therefore, the eye may become sensitive to bright light, according to expert testimony." Id., 227 Neb. at 885, 420 N.W.2d 713.

{¶ 21} A Virginia court reached the same conclusion:

{¶ 22} "Even with the lens implant, Dr. Hensle confirmed that the claimant still lacked the ability to focus normally and that 'it's not unusual to see problems with some glare because the implant itself is not the same shape or consistency. Though it's a highly regulated and high-quality piece of merchandise, it's still not the same as the natural lens in the eye.'" *Creative Dimensions Group,* 16 Va.App. at 442, 430 S.E.2d 718.

{¶ 23} The second element is permanence. Case law does not suggest that permanence entails an ironclad guarantee of success. Regardless, glasses and contacts are not permanent improvements for the reasons stated in *Lucio.* They are simply prosthetic and effectively not different from an artificial limb or brace. As stated in *Great Am. Indemn. Co. v. Indus. Comm.* (1945), 114 Colo. 91, 101, 162 P.2d 413, "We can see no more logic in holding that the Legislature intended to base disability in an eye case after correction, than in holding that in a leg or arm case, compensation should be awarded on the extent of disability after the attachment of a brace or any other appliance."

{¶ 24} Surgical intervention, while considerably more complicated, has also not, over the years, risen above its denomination as corrective. In Ohio, the majority in *Kroger* declined to characterize a corneal transplant as restorative:

{¶ 25} "To make the distinction Kroger asks would require us to find that a corneal transplant is not merely corrective, but restores vision permanently. We decline to accept that position.

{¶ 26} "Undeniably Stover sustained the substantial vision loss found by the commission. His loss resulted from severe burning and scarring of his corneas. The question is whether a transplant eliminates the loss of vision or is a correction of vision. A corneal transplant does not necessarily result in permanent or trouble-free restoration. This conclusion is substantiated by the medical testimony in this case which shows that Stover has twice suffered a rejection of the grafts in his right eye, and that at the time there was reason to believe that rejection in the left eye was possible.

{¶ 27} "We acknowledge that advances in medical technology might, at some future time, permit the conclusion that a corneal transplant eliminates the loss (as for example the re-setting of broken bones could). But, at the present and on this record, a corneal transplant is no more than a correction to lost vision. Indeed, a patient might well decide not to have a corneal transplant. The result we reach is fortified by R.C. 4123.95 which requires that R.C. 4123.01 to 4123.95, inclusive, be construed in favor of employees and their dependents." *Kroger,* 31 Ohio St.3d at 233–234, 31 OBR 436, 510 N.E.2d 356.

{¶ 28} *Kalhorn* reached the same conclusion regarding a synthetic-lens implant:

{¶ 29} "[T]he evidence demonstrates significant difficulties with Kalhorn's intraocular lens implant and * * * there is no evidence that such intraocular lenses will be risk-free in the future. Synthetic intraocular lenses are made of the same type of plastic material as are contact lenses. Kalhorn's synthetic lens, just like a contact lens, was specially prepared for his left eye, but is expected to be a permanent replacement lens. * * *

{¶ 30} "Prior to the implant surgery, Kalhorn was required to sign a consent form which set forth the risks involved with the lens implant. * * * Significantly, the consent form states that the long-term effect of a lens implantation is not known at the present time, nor is it known how long the eye can tolerate an intraocular lens implant. Some of the complications listed on the consent form are: infection, retinal detachment, corneal edema, edema of the macula, hemorrhage inside the eye, iris atrophy, glaucoma and dislocation of the implant." *Kalhorn*, 227 Neb. at 885, 420 N.W.2d 713. Similarly, in *Creative Dimensions Group*, the court stated:

{¶ 31} "The commission noted that the intraocular lens implant was not truly 'permanent.' Dr. Hensle, the claimant's treating ophthalmologist, testified by deposition that several possible circumstances might necessitate removal of the implanted lens. * * * In addition, the evidence established that claimant had suffered a post-surgical inflammation that required periodic instillation of drops into his eye. This medical testimony provides the credible evidence necessary to support the commission's finding that, under the facts of this case, claimant's intraocular lens implant was not a 'permanent' restoration of his vision." *Creative Dimensions Group*, 16 Va.App. at 442, 430 S.E.2d 718.

{¶ 32} All three of these opinions rest on the belief that medical technology has not progressed to the point where permanent, trouble-free improvement can be confidently predicted. These decisions, however, were issued in the 1980s and 1990s—the last in 1993. The question now is whether 11 years later, medical advances *have* transformed a corneal lens implant, once considered a correction, into a restoration.

{¶ 33} There are some who believe this transformation to be impossible. In his dissent from the Georgia Supreme Court's holding in *Lee Connell Constr. Co. v. Swann* (1985), 254 Ga. 121, 327 S.E.2d 222, Justice Smith reflected:

{¶ 34} "Man has not yet and almost certainly will never be able to duplicate human organs to the point where the person suffering an injury to one of his organs will be made whole after replacement.

{¶ 35} "* * *

{¶ 36} "I venture to say that there is no member of this court who would swap his natural eye for a transplant and a pair of eyeglasses and believe that he had been made whole.

{¶ 37} "* * *

{¶ 38} "Medical science has come a long way, but there is no way a doctor or anyone else can duplicate God's work * * *." Id., 254 Ga. at 122, 327 S.E.2d 222 (Smith, J., dissenting).

{¶ 39} Others, however, believe that that day has arrived. Justice Holmes, in his dissent in *Kroger,* asserted that routine eye surgery had crossed the threshold from corrective to restorative:

{¶ 40} "[T]he majority's characterization of keratoplasties as failing to 'eliminate the loss' because of uncertainties in 'the current state of the medical art' ignores the reality that such operations have been regularly performed as standard medical procedure since the 1940s. Nor has the 'current state of the medical art' diminished Stover's expectations and efforts at surgically obtaining normal, healthy eyes, since he had another transplantation surgery immediately following the Industrial Commission's award to him for permanent loss. As a matter of scientific fact, a successful keratoplasty will eliminate, on a permanent basis, any organic loss which Stover originally experienced. To the degree the new corneas do not provide the previously enjoyed standard of vision, their function may be corrected by artificial lenses, i.e., glasses." *Kroger,* 31 Ohio St.3d at 243, 31 OBR 436, 510 N.E.2d 356 (Holmes, J., dissenting).

{¶ 41} The court of appeals in this litigation reached the same conclusion regarding corneal implants:

{¶ 42} "[B]ased on the evidence in this case, claimant's eyes were fully repaired surgically in a way similar to the way in which a severed finger can be reattached. [*State ex rel.*] *Welker* [*v. Indus. Comm.* (2001), 91 Ohio St.3d 98, 742 N.E.2d 622], supra. There have been significant advances in medical technology with regard to cataract surgery. It is as if the person receives a completely new set of eyes."

{¶ 43} There are three problems with this reasoning. First, the court's analogy to *Welker* is inappropriate. The case at bar involves the implantation of an artificial device. *Welker* involved the successful reattachment of claimant's own thumb. *Welker* stressed the distinction between the two, quoting with approval a Rhode Island case:

{¶ 44} " 'Live tissue from an injured worker's body applied by a skilled surgeon as a replacement for an injured thumb is not equatable with the prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial.' "

*Welker*, 91 Ohio St.3d at 100–101, 742 N.E.2d 622, quoting *Fogarty v. State* (1967), 103 R.I. 228, 231, 236 A.2d 247.

{¶ 45} The second deficiency lies in the medical evidence noted by the lower court. There is none of record. All of the medical literature cited by the court through its magistrate was outside the record and may well have reflected the views of only a segment of the medical populace.

{¶ 46} The final problem lies in the Tenth District Court of Appeals' decision in *State ex rel. Parsec, Inc. v. Agin*, 155 Ohio App.3d 303, 2003-Ohio-6186, 800 N.E.2d 1180. There, just six weeks prior to its opinion in this case, the court issued a holding contrary to its decision here. Citing *Kroger*, the court held that the current state of medical art still had *not* elevated corneal implants—like the ones currently at issue—to the level of restoration. Claimant's postsurgical improvement, therefore, could not be considered. The court, moreover, specifically distinguished *Welker* for the reasons mentioned earlier.

{¶ 47} As always, a decision in this type of case is a difficult one. Regardless of precedent, there will always be those who argue that a total-loss-of-vision award to a claimant who can see constitutes a windfall. Perhaps the best response to that assertion was articulated by a Maryland court of appeals:

{¶ 48} "Turning to Employer's argument that the legislature could not have intended such a result, because it might give Chin what Employer views as a windfall, we observe that the beneficent intent and the social policies underlying the worker compensation law do not necessarily produce mathematically logical results in every case. We are not dealing with mere mathematics, but with the legislative response to problems of an industrial society." *Dawson's Charter Serv. v. Chin* (1986), 68 Md.App. 433, 444, 511 A.2d 1138.

{¶ 49} Recognition of the legislature's role prompts two final observations. First, as claimant stresses, the General Assembly has also promulgated R.C. 4123.95, which demands liberal statutory construction in favor of claimants. Second, if the current statutory scheme is outdated, then it is more appropriately the legislature's role to revise it. For example, the Michigan Supreme Court observed:

{¶ 50} "If ophthalmological advances and refinements in the use of contact lens [have] in fact rendered the amended statute inconsonant with its original legislative intent, it is the province of the legislature to say so. We construe the statute in the plain meaning of its wording." *Lindsay v. Glennie Industries, Inc.* (1967), 379 Mich. 573, 578, 153 N.W.2d 642.

{¶ 51} In this case, R.C. 4123.57(B) clearly makes uncorrected vision the applicable standard. Case law, in turn, distinguishes between correction and restoration/recovery for purposes of making an award and has presumably left

the terms deliberately undefined in order to accommodate advances in medical procedure. The court of appeals in this case felt that the time had arrived to reclassify corneal lens implants as restorative. We do not agree and accordingly reverse its judgment.

Judgment reversed.

MOYER, C.J., F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

RESNICK, J., not participating.

———————

Reminger & Reminger Co., L.P.A., Paulette M. Ivan and Ronald A. Fresco, for appellee General Electric Corporation.

Jim Petro, Attorney General, and Thomas L. Reitz, Assistant Attorney General, for appellee Industrial Commission.

Mark Ferestad Law Firm and Mark A. Ferestad, for appellant.

Philip J. Fulton & Associates, Philip J. Fulton and William A. Thorman III, urging reversal for amicus curiae, Ohio Academy of Trial Lawyers.