THE STATE EX REL. LA-Z-BOY FURNITURE GALLERIES, APPELLANT, *v.*

THOMAS ET AL., APPELLEES.

[Cite as *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*,

**126 Ohio St.3d 134, 2010-Ohio-3215.]**

*Workers' compensation — R.C. 4123.57(B) — Loss of vision — Claimant's industrial injury dislodged corneal transplant necessitated by nonallowed condition of keratoconus — Preinjury transplant corrected claimant's vision from 20/200 to 20/50 — Postinjury surgery corrected vision from 20/200 back to 20/50 — Commission did not abuse discretion in using 20/50 preinjury corrected vision as measure of preinjury visual acuity for purposes of calculating award.*

(No. 2009-1706 — Submitted May 25, 2010 — Decided July 13, 2010.)

APPEAL from the Court of Appeals for Franklin County, No. 08AP-827,

2009-Ohio-4546.

_____

**Per Curiam**.

**{¶ 1}** This is an appeal filed as of right by appellant La-Z-Boy Furniture Galleries for a loss-of-vision award granted to its employee, appellee Millard Thomas. Thomas has a long history of keratoconus in both eyes. Keratoconus causes the cornea to thin and bulge, which can significantly impair vision. Severe cases can require a corneal transplant or implant due to scarring, extreme thinning, or contact-lens intolerance.

**{¶ 2}** Thomas had a corneal transplant in his left eye in 2005. Before the transplant, Thomas's left-eye vision was 20/200. After the procedure, it was 20/50. On May 1, 2006, Thomas injured that eye, losing the transplanted cornea, while working for La-Z-Boy. After his industrial accident, the vision in his left

eye reverted to 20/200. A corneal implant was then inserted into the damaged eye, and his vision returned to 20/50.

**{¶ 3}** Thomas applied to appellee Industrial Commission of Ohio for compensation under R.C. 4123.57(B), alleging that he had a total loss of vision in the left eye. A district hearing officer granted Thomas's application:

**{¶ 4}** "[P]rior to the date of injury in this claim, injured worker had previously undergone a left eye corneal transplant as a result of an occular [sic] disease in that eye.

**{¶ 5}** "The employer['s] and administrator['s] argument that since injured worker had a total loss of vision in the left eye prior to the date of injury in this claim and therefore is not entitled to [a] loss of vision award is not well taken by the District Hearing Officer. The above argument seems to run counter to the intent of the statute. The purpose of an award of compensation pursuant to [R.C.] 4123.57(B) is to compensate for the loss of a body part or body function resulting from the industrial injury. In this case the injured worker had a functioning left eye prior to the date of injury. The District Hearing Officer declines to differentiate between the mechanism[s] of function for purposes of this order. It would seem unfair to allow a loss of vision award to an injured worker who had a 'natural' functioning eye prior to date of injury but not to an individual who had a functional eye only as a result of a previous medical procedure which was able to restore functionality to the eye."

**{¶ 6}** On appeal, a staff hearing officer reduced the amount of the award to 75 percent, but did not explain why she reduced the amount or how she arrived at that figure. Further appeal was refused.

**{¶ 7}** La-Z-Boy filed a complaint in mandamus in the Court of Appeals for Franklin County, and Thomas filed a cross-claim. La-Z-Boy's complaint alleged that Thomas had suffered no vision loss, because his uncorrected vision was the same after the industrial injury as it was before. It argued that previous

Ohio cases had used uncorrected vision to assess the amount of vision lost under R.C. 4123.57(B). La-Z-Boy asserted that transplants and implants corrected vision and thus could not factor into the analysis. It urged the court to find that because Thomas's uncorrected vision was 20/200 both before and after the injury, no loss had occurred.

{¶ 8} The court of appeals acknowledged that earlier cases used uncorrected vision to measure R.C. 4123.57(B) vision loss. It did not, however, rely on those cases, ruling instead that to deny the claim would amount to using a nonallowed condition (the keratoconus) to defeat Thomas's application for compensation, contrary to *State ex rel. Waddle v. Indus. Comm.* (1993), 67 Ohio St.3d 452, 619 N.E.2d 1018.

{¶ 9} Thomas's cross-claim alleged that the commission had abused its discretion in reducing his award from 100 percent vision loss to 75 percent. The court of appeals agreed and granted his request for a writ of mandamus that ordered the commission to issue an award for a total loss of vision in the left eye.

{¶ 10} La-Z-Boy now appeals to this court as of right.

{¶ 11} R.C. 4123.57(B) states:

{¶ 12} "In cases included in the following schedule the compensation payable * * * shall continue during the periods provided in the following schedule:

{¶ 13} "* * *

{¶ 14} "For the loss of the sight of an eye, one hundred twenty-five weeks.

{¶ 15} "For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. 'Loss of uncorrected

vision' means the percentage of vision actually lost as the result of the injury or occupational disease."

{¶ 16} Consistent with the statute, we have declared uncorrected vision to be the standard by which postinjury vision must be measured. *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356; *State ex rel. Gen. Elec. Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, ¶ 12. These decisions stressed that correction enhances vision but does not eliminate the vision loss. Id. at ¶ 18-23; *Kroger* at 234. Glasses and contact lenses enhance vision until they become lost, broken, or outdated. Implants and transplants, while much more sophisticated, also do not completely replicate the extraordinary capabilities of one's own lens or cornea. As we noted in *Kroger*, corneal transplants are susceptible to rejection. Id. at 234. In discussing lens implants, we observed that unlike the eye's natural lens, an implant cannot change focus or filter light. *Gen. Elec.* at ¶ 20. Accordingly, as recently as 2008, we continued to characterize these procedures as mere corrections to vision that could not be used to determine postinjury visual acuity. *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372.

{¶ 17} The litigants agree that Thomas's postinjury corneal implant must be excluded from consideration, meaning that his postinjury vision for R.C. 4123.57(B) purposes is 20/200. They disagree, however, on the applicable measure of *preinjury* vision. All of the jurisprudence from this court on the issue of R.C. 4123.57(B) vision loss has involved a dispute over the measure of postinjury visual acuity. This is, therefore, a case of first impression. Never have we been confronted with an individual who has had complicated corrective surgery both before and as a result of an industrial injury.

{¶ 18} La-Z-Boy argues that because uncorrected vision is the postinjury measurement, it must also be the preinjury standard. Appellees propose that in an

4

unusual situation such as this, a claimant's uncorrected preinjury vision may not always be the best baseline from which to determine the amount of postinjury loss.

{¶ 19} The commission is particularly concerned about situations in which the preinjury correction significantly predates the industrial injury, and we share that concern. Had Thomas's corneal transplant occurred in 1985 rather than 2005, for example, he would have had 20/50 vision not for just one, but for 21 years prior to his industrial accident. Under La-Z-Boy's proposal, the appropriate measure of Thomas's preinjury vision would be the 20/200 vision that Thomas had as a child in 1985, rather than the 20/50 vision that he enjoyed for over two decades. We cannot endorse this result.

{¶ 20} Even when preinjury correction does not significantly precede the industrial injury, we can foresee situations in which the appropriate measure of preinjury vision could require a more flexible approach. Perhaps most obvious is a situation in which glasses or contact lenses are used to further correct a surgical correction. In this case, the record is silent as to whether Thomas used glasses to correct his preinjury 20/50 vision to 20/20. If he did, his 20/200 vision would seem largely irrelevant since his glasses would have been refracted to correct 20/50 vision, not 20/200. The presence of what effectively are two corrections supports the desirability of affording the commission some discretion in establishing a claimant's preinjury visual baseline.

{¶ 21} As an alternative basis for upholding the commission's decision, the court of appeals cited *State ex rel. Waddle v. Indus. Comm.*, 67 Ohio St.3d 452, 619 N.E.2d 1018. This reliance is misplaced.

{¶ 22} Waddle had sustained industrial injuries to his neck, shoulder, arm, and back and was awarded temporary total disability benefits. He later developed serious heart problems unrelated to his work. When Waddle applied for permanent total disability compensation, he asserted that his nonallowed heart

condition was immaterial to the merit of his claim because his allowed conditions, standing alone, prevented sustained remunerative employment. The commission was not persuaded that Waddle was incapable of sustained remunerative employment and denied his claim for permanent total disability benefits, prompting his petition in mandamus.

{¶ 23} The court of appeals vacated the commission's order and returned the cause to the commission to consider Waddle's nonallowed heart condition as an independent disability factor under *State ex rel. Stephenson v. Indus. Comm.* (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. We reversed, holding that Waddle's nonallowed conditions could never factor into the analysis of a claim for permanent total disability benefits and hence could not advance or defeat such an application. The key question was instead whether the allowed medical conditions, either alone or coupled with nonmedical vocational factors, so disabled the claimant as to foreclose employment.

{¶ 24} *Waddle* is difficult to apply to Thomas's situation. In *Waddle*, the nonallowed heart condition could easily be excluded from the analysis. The commission simply had to determine whether the allowed conditions for injuries to Waddle's neck, back, shoulder, and arm foreclosed sustained remunerative work. Here, separating the effects of Thomas's allowed conditions from the nonallowed is more problematic. Thomas's allowed eye conditions are tied directly to his nonallowed eye disease. If Thomas did not have keratoconus, he would not have had a transplanted cornea to dislocate. Moreover, if Thomas's keratoconus cannot be considered, it is unclear what the preinjury vision baseline would be. It seemingly could not be 20/200, because that level of visual acuity was due to the keratoconus. Nor could it be 20/50, because the implant responsible for that degree of acuity also arose from the keratoconus. Thus, the court of appeals' logic appears to leave the commission and this court without a

preinjury figure against which to measure Thomas's postinjury vision. Its reasoning cannot, therefore, be sustained.

{¶ 25} In conclusion, we find that the commission did not abuse its discretion in using Thomas's 20/50 vision as the measure of his preinjury visual acuity. The judgment of the court of appeals is affirmed.

Judgment affirmed.

BROWN, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Stefanski & Associates, L.L.C., and Janice T. O'Halloran, for appellant.

Michael Flament, for appellee Millard Thomas.

Richard Cordray, Attorney General, and Andrew J. Alatis, Assistant Attorney General, for appellee Industrial Commission.

_____