[Cite as *State ex rel. Baker v. Coast to Coast Manpower, L.L.C.,* 129 Ohio St.3d 138, 2011-Ohio-2721.]

THE STATE EX REL. BAKER, APPELLANT, *v.* COAST TO COAST MANPOWER, L.L.C., APPELLEE; INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

[Cite as *State ex rel. Baker v. Coast to Coast Manpower, L.L.C.,*
129 Ohio St.3d 138, 2011-Ohio-2721.]

*Workers' compensation — R.C. 4123.57(B) — Loss of sight – Surgical removal of lens or cornea due to workplace injury does not automatically entitle claimant to award for total loss of vision — Proper measure of award based on loss of sight is percentage of vision actually lost prior to any corrective treatment — Loss of vision measuring less than statutory minimum of 25 percent is not compensable as scheduled loss under R.C. 4123.57(B).*

(No. 2010-0211 — Submitted March 2, 2011 — Decided June 9, 2011.)

APPEAL from the Court of Appeals for Franklin County, No. 09AP-287, 2009-Ohio-6663.

_____

LUNDBERG STRATTON, J.

{¶ 1} Today, we are asked to determine whether the surgical removal of the lens of an eye in the course of treatment for a workplace injury entitles the injured worker to compensation pursuant to R.C. 4123.57(B) for a total loss of sight.

{¶ 2} We decline to adopt a bright-line rule that a claimant is entitled to an award for a total loss of vision under R.C. 4123.57(B) any time the natural lens or cornea of the eye is surgically removed as a result of a workplace injury. The court of appeals below properly calculated the loss of sight based on the percentage of vision actually lost as a result of the injury, prior to any corrective surgery. Because the amount of vision lost was less than the minimum 25 percent

required by R.C. 4123.57(B), the claimant was not entitled to an award for loss of sight.  We affirm the judgment of the court of appeals.

**Factual and Procedural History**

{¶ 3}   On November 3, 2007, appellant Jamey D. Baker was struck in the right eye by a piece of metal while working for appellee, Coast to Coast Manpower, L.L.C.  He went to an urgent-care facility, where his visual acuity in that eye measured 20/25.  He was immediately transferred to a hospital, where an ophthalmologist surgically removed the metal piece and repaired the laceration of his cornea.

{¶ 4}   Baker's workers' compensation claim was allowed for corneal foreign body and laceration of the right eye.  It was later amended to include traumatic cataract.   On February 18, 2008, Dr. Jack Hendershot surgically removed the cataract and replaced the natural lens with an intraocular lens implant.   Prior to the cataract surgery, Baker's visual acuity in his right eye measured 20/30.  Following the lens implant, his visual acuity improved to 20/25.

{¶ 5}   Baker filed a motion with the Bureau of Workers' Compensation ("BWC") for loss of vision of the right eye under R.C. 4123.57(B), based on the cataract surgery in which his natural lens was removed and replaced by an implant.  Dr. Richard Tam examined Baker on behalf of the BWC and, asked to assume that Baker's vision was 20/20 before the accident, concluded that Baker had an eight percent vision impairment as a result of his injury.

{¶ 6}   A district hearing officer granted Baker an 8 percent permanent partial disability award based on the vision impairment.  A staff hearing officer vacated that order and granted an award for a total loss of vision in the right eye. The employer appealed on the basis that Baker's "loss of uncorrected vision" did not exceed 25 percent prior to surgery as required by R.C. 4123.57(B).   The Industrial Commission agreed.  The commission vacated the order of the staff hearing officer and denied the claimant's request for loss-of-vision benefits.

**{¶ 7}** Baker filed a complaint in the Tenth District Court of Appeals for a writ of mandamus ordering the commission to grant his request for compensation for a total loss of vision. The court of appeals relied on *State ex rel. Kroger v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356, and held that Baker's vision loss must be determined by comparing his preinjury uncorrected vision with his presurgical uncorrected vision. Because his loss of uncorrected vision was less than 25 percent, the court concluded that Baker did not meet the statutory threshold for even a partial loss-of-vision award. *State ex rel. Baker v. Coast to Coast Manpower, L.L.C.,* 10th Dist. No. 09AP-287, 2009-Ohio-6663, ¶ 5. The court denied the writ.

**{¶ 8}** This cause is before this court on Baker's appeal as of right. The Industrial Commission has changed its position and has appealed in support of Baker's argument that he is entitled to an award for total loss of vision.

### Legal Analysis

**{¶ 9}** The Industrial Commission's order denying benefits for loss of vision is a decision as to the extent of disability and not subject to appeal. *Kroger,* paragraph one of the syllabus. Thus, mandamus is the proper method to examine whether the commission has abused its discretion. Id., 31 Ohio St.3d at 232, 31 OBR 436, 510 N.E.2d 356. For a court to issue a writ of mandamus, a relator must demonstrate a clear legal right to the relief sought and a clear legal duty of the respondent to provide such relief. *State ex rel. AutoZone, Inc., v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, ¶ 14. If the record contains some evidence to support the commission's findings, there has been no abuse of discretion and a court has no basis to award a writ of mandamus. Id.

**{¶ 10}** R.C. 4123.57(B) sets forth rates of compensation for the loss of listed body parts. "Loss" includes loss of use of a body part. *State ex rel. Walker*

*v. Indus. Comm.* (1979), 58 Ohio St.2d 402, 12 O.O.3d 347, 390 N.E.2d 1190. The statute's provisions relevant to the eye provide:

{¶ 11} "For the loss of the sight of an eye, one hundred twenty-five weeks.

{¶ 12} "For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. 'Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease."

{¶ 13} It is undisputed that Baker's vision measured 20/25 following the injury and that he had an 8 percent visual impairment. It is also undisputed that he developed a traumatic cataract as a result of his injury that was surgically removed and that his lens was replaced by an intraocular lens implant. Appellants contend that the surgical removal of his natural lens during the cataract surgery resulted in a total loss of vision. Appellants ask us to establish a broad rule that compensation for a total loss of vision is warranted any time the natural lens is removed during surgical repair of the eye due to a workplace injury, because when a lens is surgically removed, the claimant has permanently lost a natural part of the eye that is necessary for sight.

{¶ 14} Appellee, on the other hand, argues that the loss of the lens, by itself, does not result in a total loss of sight. The plain language of the statute requires the claimant to have at least a 25 percent loss of sight. Here, Baker's decreased visual acuity did not reach the 25 percent statutory threshold for even a partial loss-of-vision award. Therefore, he is not entitled to an award for total loss of sight.

**{¶ 15}** We have previously awarded compensation for a total loss of vision in cases where a claimant lost a lens or cornea as a result of a workplace injury. In *Kroger*, 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356, the claimant was exposed to ammonia that burned his corneas. He underwent a corneal transplant in his right eye. The issue in *Kroger* involved whether to measure the loss of vision before or after the transplant. We held that improvement of vision from the transplant was a correction to vision that is not to be considered when determining the percentage of vision actually lost. Consequently, the claimant in *Kroger* was entitled to compensation for a total loss of vision based upon his severely impaired vision prior to removal of his burned cornea.

**{¶ 16}** In *State ex rel. Gen. Elec. Corp. v. Indus. Comm*., 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, the claimant received an electrical shock that caused cataracts in both eyes, and his visual acuity decreased to 20/200. The claimant had cataract surgery and received intraocular lens implants in both eyes. We upheld the commission's award of compensation for total loss of sight in both eyes based upon his loss of uncorrected vision as measured after the injury, but prior to any corrective surgery. In both *Kroger* and *Gen. Elec.*, the claimants lost a natural part of the eye, but each had suffered a significant loss of uncorrected vision that by itself satisfied the statutory standard to support the award for loss of sight.

**{¶ 17}** In *State ex rel. AutoZone,* 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, a screwdriver perforated the claimant's left eye. As a result, he lost his natural lens. When he applied for total-loss compensation, the claimant submitted the report of his physician, who concluded that the claimant was legally blind as a result of the injury. We determined that a medical opinion of legal blindness constituted some evidence that the claimant had lost the sight of the eye, and we upheld an award of compensation for total loss of sight. Id. at ¶ 18.

{¶ 18} The appellants also cite *State ex rel. Parsec, Inc. v. Agin,* 155 Ohio App.3d 303, 2003-Ohio-6186, 800 N.E.2d 1180, in which the Tenth District Court of Appeals issued a writ of mandamus ordering the Industrial Commission to grant compensation for total loss of vision to a claimant who had suffered intraocular penetration when a wire struck his left eye. The claimant underwent surgery to repair the injury, which involved removal of the traumatized lens and insertion of a replacement lens. The court, adopting the magistrate's findings, concluded that the claimant's loss of vision in his left eye, before correction, was total. Id. at ¶ 28-29.

{¶ 19} *AutoZone* and *Parsec* are distinguishable from the facts in Baker's case. Similar to the claimants in *Kroger* and *Gen. Elec.,* the claimants in *AutoZone* and *Parsec* both suffered major vision loss far exceeding the statutory minimum of 25 percent. It was this loss of uncorrected vision following the injury, not the loss of the lens or cornea by itself, that formed the basis for the award of compensation for a total loss of sight in the eye. Baker never experienced any such loss.

{¶ 20} When an injured worker applies for a scheduled-loss award, "[t]he question under R.C. 4123.57(B) is whether a claimant has suffered loss of sight or partial loss of sight." *AutoZone,* 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, ¶ 18. The statutory standard for measuring even a partial loss of sight is "the percentage of vision actually lost as a result of the injury." R.C. 4123.57(B). The loss of vision is determined by the measurement of uncorrected vision following the injury, but prior to any corrective surgery such as a lens implant or cornea transplant. *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545, ¶ 16; *Gen. Elec.,* 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, ¶ 16.

{¶ 21} Appellants emphasize the causal connection between the injury and the removal of a natural part of the eye, either lens or cornea, that results in

the loss of sight. This bright-line approach disregards the plain language of the statute. R.C. 4123.57(B) requires a loss of sight of an eye for the employee to be entitled to compensation. For even a partial loss of sight, the injured worker must establish at least a 25 percent loss of uncorrected vision, defined as "the percentage of vision actually lost as the result of the injury or occupational disease."

**Conclusion**

{¶ 22} It is undisputed that Baker's vision in his injured right eye measured 20/25 immediately following the accident. Prior to undergoing cataract surgery several months later, his vision was 20/30. Dr. Tam opined prior to the cataract surgery that Baker had suffered an 8 percent visual impairment. After surgery, his vision returned to 20/25. At no time following his injury did Baker's "loss of uncorrected vision" reach the statutory threshold of 25 percent. It follows that he was unable to establish a total loss of sight. Therefore, we hold that Baker has not suffered a loss of sight that is compensable under R.C. 4123.57(B).

{¶ 23} Because there was some evidence supporting the commission's decision to deny loss-of-vision benefits, there was no abuse of discretion and the court below had no basis to grant a writ of mandamus. Consequently, we affirm the judgment of the court of appeals.

Judgment affirmed.

O'DONNELL and MCFARLAND, JJ., concur.

CUPP, J., concurs separately.

O'CONNOR, C.J., and PFEIFER and MCGEE BROWN, JJ., dissent.

MATTHEW W. MCFARLAND, J., of the Fourth Appellate District, sitting for LANZINGER, J.

_____

**CUPP, J., concurring.**

{¶ 24} I am generally in accord with the discussion and analysis of the lead opinion. I also concur in the majority's decision to affirm the judgment of the court of appeals. I write separately, however, to express the hope that future loss-of-use analysis will be assisted by an updated perspective of medical science as it relates to visual improvement.

{¶ 25} This case is before us largely because implants and transplants continue to be classified as corrective rather than restorative. That characterization was first articulated in *State ex rel. Kroger v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356, reaffirmed in 2004 in *State ex rel. Gen. Elec. Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, affirmed again just last year in *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545, and now here. In continuing to rely on *Kroger*, however, we are, by extension, also relying on the state of medical science as it was 24 years ago when that case was decided. At some point we must consider how long it is appropriate for us to do so, given the vast improvements in medical science that have occurred since then. But, to do so, we must have an adequate record on which to base our judgment. Perhaps an appropriate case will come before the Industrial Commission in which that record can be made, and the commission can evaluate the available evidence on the present state of medical science in this regard.

_____

**MCGEE BROWN, J., dissenting.**

{¶ 26} I respectfully dissent. Although it does not say so explicitly, the majority breaks new ground by treating lens implants as restorative, rather than corrective. This case does not warrant such a dramatic departure from the court's precedent in cases involving workplace eye injuries. Moreover, by tying compensation under R.C. 4123.57(B) to the degree of loss demonstrable before a corrective procedure, the majority creates new law with unfortunate

consequences. In the interests of stare decisis and of deferring to the General Assembly's determinations regarding compensation for workplace injuries, I would reverse.

{¶ 27} Pursuant to R.C. 4123.57(B), a worker who loses the sight of an eye as a result of a workplace injury is entitled to 125 weeks of compensation. Additionally, R.C. 4123.57(B) guarantees compensation when a workplace injury causes the "loss of uncorrected vision." Under our case law interpreting this statute, the benefit of any postinjury correction to eyesight is not included in the calculation of compensation owed to the injured worker. *State ex. rel. Gen. Elec. Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, at ¶51 (explaining that "[c]ase law * * * distinguishes between correction and restoration/recovery for purposes of making an award" and holding that "the time had [not] arrived to reclassify corneal lens implants as restorative"). However, if a procedure could permanently restore eyesight to its preinjury state, the effects of that restoration would limit the compensation owed to the injured worker.

{¶ 28} Over the years, this court repeatedly has been faced with the question whether intraocular implants that mitigate eye injuries qualify as corrective. See, e.g., *State ex rel. Kroger Co. v. Stover* (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356; *State ex rel. Gen. Elec.,*103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588; *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372; *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545. We have expressed optimism that advances in medical technology will bring us a device or procedure that can eliminate the effects of the injury for the purposes of R.C. 4123.57(B), but we have consistently found that modern eye procedures remain merely corrective. See, e.g., *Kroger* at 234. These improvements simply do not reinstate eyesight to its preinjury quality, and their permanence is uncertain. See, e.g., *La-Z-Boy Furniture Galleries* at ¶16

(summarizing previous findings that "[i]mplants and transplants * * * do not completely replicate the extraordinary capabilities of one's own lens or cornea. * * * [T]ransplants are susceptible to rejection [and] cannot change focus or filter light").

{¶ 29} The majority ostensibly does not reach the corrective/restorative dichotomy, because eye tests never demonstrated that Baker lost at least 25 percent of his vision, the threshold for compensation under R.C. 4123.57(B). However, the effect of the majority opinion is to break with our precedent and to treat lens implants as restorative. Without the replacement lens, Baker cannot see. He clearly exceeds the 25 percent threshold. If Baker's lens implant were treated as corrective, therefore, we would compensate him for total loss of sight. Yet the majority determines that Baker's injury is insufficient to justify compensation. The only way to reach this outcome is to presume that the lens implant completely and permanently repaired the loss of a lens necessitated by Baker's workplace injury, i.e., to treat the lens implant as restorative. I cannot see a justification for moving away from this court's precedent based on the record before us.

{¶ 30} In addition to departing from precedent, the majority creates two new limits on compensation in this context. Despite the variable nature of eye injuries (such as the progressive cataract suffered by Baker), R.C. 4123.57(B) does not dictate when or how the Industrial Commission should measure loss of sight. This court's prior decisions likewise do not prescribe the mechanics of that evaluation. Nonetheless, the majority incorporates new requirements that limit when workers who lose their eyesight can receive compensation. I would leave that determination to the General Assembly.

{¶ 31} First, the majority interprets our decisions in this context to tie compensation to the degree of injury *before* correction. Accordingly, the majority identifies Baker's 8 percent loss of vision, tested before the removal of his lens, as the appropriate touchstone for calculating compensation. I would hold that our

decisions tie compensation to the degree of injury *without* correction. And here, because Baker cannot see through his right eye without the benefit of the replacement lens, I would grant total-loss compensation.

{¶ 32} I would not establish an artificial deadline for calculating loss of vision at the moment when the injured worker, following his doctor's advice, takes action to address his condition before it completes its inevitable destruction of his sight. We can just as easily conclude, as Baker and the Industrial Commission request here, that the removal of a lens in the course of corrective surgery necessitated by workplace injury constitutes the loss of sight for the purposes of R.C. 4123.57(B).

{¶ 33} Second, the majority's decision erects a hurdle for the injured worker that is not mandated by the statute or by our precedent. The majority concludes that Baker is not entitled to compensation, because vision tests never demonstrated a loss of at least 25 percent of his sight. But we do not need test results to tell us that Baker can no longer see through the injured eye without the benefit of his corrective replacement lens. This is an undeniable fact. We can be hopeful that Baker's corrective procedure is permanently successful, but we must be mindful that new medical technologies sometimes fail and that our bodies do not always comply with doctors' plans. Moreover, regardless of the lens implant's success, the workplace injury deprived Baker of the irreplaceable wonder of his natural eyesight.

{¶ 34} The employer suggests that to allow Baker to receive workers' compensation benefits for total vision loss will result in a windfall to him. Such an argument misses the point. Baker sustained the loss of his natural eye lens due to a workplace injury, and the General Assembly has determined that such harm is compensable.

{¶ 35} This appeal presents unresolved questions for the legislature. The court, however, should not be making new law. Had Baker waited until his

natural lens was opaque, the majority would find that he is entitled to compensation; therefore, from the majority opinion today, we will apparently require that injured workers wait until a cataract caused by a workplace injury obscures sight before undergoing corrective surgery.  In other words, injured workers seeking compensation to which they are entitled must choose between following doctors' orders or receiving compensation for workplace injuries that undeniably wrecked their eyesight.  The result we reach today will require injured workers to consult lawyers before they decide on appropriate medical treatment.

{¶ 36} Baker, because of a workplace injury, lost sight in his right eye.  Yet because he followed his doctor's orders and had a replacement lens implanted before the injury completed its damage, the majority will deprive him of compensation.  We should not create an incentive for injured workers to delay necessary medical treatment, nor should we pretend that a replacement lens is as good as the original.  Instead of producing this unfortunate result, we should treat Baker like any other worker who loses the sight of an eye.  Therefore, I dissent.

O'CONNOR, C.J., and PFEIFER, J., concur in the foregoing opinion.

_____

Gallon, Takacs, Boissoneault & Schaffer Co., L.P.A., and Theodore A. Bowman, for appellant Baker.

Michael DeWine, Attorney General, and Colleen C. Erdman, Assistant Attorney General, for appellant Industrial Commission of Ohio.

Reminger Co., L.P.A., Amy S. Thomas, and Mick Proxmire, for appellee.

_____