McGee Brown, J.,
dissenting.
{¶ 26} I respectfully dissent. Although it does not say so explicitly, the majority breaks new ground by treating lens implants as restorative, rather than corrective. This case does not warrant such a dramatic departure from the court’s precedent in cases involving workplace eye injuries. Moreover, by tying compensation under R.C. 4123.57(B) to the degree of loss demonstrable before a corrective procedure, the majority creates new law with unfortunate consequences. In the interests of stare decisis and of deferring to the General Assembly’s determinations regarding compensation for workplace injuries, I would reverse.
{¶ 27} Pursuant to R.C. 4123.57(B), a worker who loses the sight of an eye as a result of a workplace injury is entitled to 125 weeks of compensation. Additionally, R.C. 4123.57(B) guarantees compensation when a workplace injury causes the “loss of uncorrected vision.” Under our case law interpreting this statute, the benefit of any postinjury correction to eyesight is not included in the calculation of compensation owed to the injured worker. State ex. rel. Gen. Elec. Corp. v. Indus. Comm., 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, at ¶51 (explaining that “[c]ase law * * * distinguishes between correction and restoration/recovery for purposes of making an award” and holding that “the time had *144 [not] arrived to reclassify corneal lens implants as restorative”)- However, if a procedure could permanently restore eyesight to its preinjury state, the effects of that restoration would limit the compensation owed to the injured worker.
{¶ 28} Over the years, this court repeatedly has been faced with the question whether intraocular implants that mitigate eye injuries qualify as corrective. See, e.g., State ex rel. Kroger Co. v. Stover (1987), 31 Ohio St.3d 229, 31 OBR 436, 510 N.E.2d 356; State ex rel. Gen. Elec., 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588; State ex rel. AutoZone, Inc. v. Indus. Comm., 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372; State ex rel. Lar-Z-Boy Furniture Galleries v. Thomas, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545. We have expressed optimism that advances in medical technology will bring us a device or procedure that can eliminate the effects of the injury for the purposes of R.C. 4123.57(B), but we have consistently found that modern eye procedures remain merely corrective. See, e.g., Kroger at 234. These improvements simply do not reinstate eyesight to its preinjury quality, and their permanence is uncertain. See, e.g., Lob-Z-Boy Furniture Galleries at ¶ 16 (summarizing previous findings that “[i]mplants and transplants * * * do not completely replicate the extraordinary capabilities of one’s own lens or cornea. * * * [Transplants are susceptible to rejection [and] cannot change focus or filter light”).
{¶ 29} The majority ostensibly does not reach the corrective/restorative dichotomy, because eye tests never demonstrated that Baker lost at least 25 percent of his vision, the threshold for compensation under R.C. 4123.57(B). However, the effect of the majority opinion is to break with our precedent and to treat lens implants as restorative. Without the replacement lens, Baker cannot see. He clearly exceeds the 25 percent threshold. If Baker’s lens implant were treated as corrective, therefore, we would compensate him for total loss of sight. Yet the majority determines that Baker’s injury is insufficient to justify compensation. The only way to reach this outcome is to presume that the lens implant completely and permanently repaired the loss of a lens necessitated by Baker’s workplace injury, i.e., to treat the lens implant as restorative. I cannot see a justification for moving away from this court’s precedent based on the record before us.
{¶ 30} In addition to departing from precedent, the majority creates two new limits on compensation in this context. Despite the variable nature of eye injuries (such as the progressive cataract suffered by Baker), R.C. 4123.57(B) does not dictate when or how the Industrial Commission should measure loss of sight. This court’s prior decisions likewise do not prescribe the mechanics of that evaluation. Nonetheless, the majority incorporates new requirements that limit when workers who lose their eyesight can receive compensation. I would leave that determination to the General Assembly.
*145 {¶ 31} First, the majority interprets our decisions in this context to tie compensation to the degree of injury before correction. Accordingly, the majority identifies Baker’s 8 percent loss of vision, tested before the removal of his lens, as the appropriate touchstone for calculating compensation. I would hold that our decisions tie compensation to the degree of injury without correction. And here, because Baker cannot see through his right eye without the benefit of the replacement lens, I would grant total-loss compensation.
{¶ 32} I would not establish an artificial deadline for calculating loss of vision at the moment when the injured worker, following his doctor’s advice, takes action to address his condition before it completes its inevitable destruction of his sight. We can just as easily conclude, as Baker and the Industrial Commission request here, that the removal of a lens in the course of corrective surgery necessitated by workplace injury constitutes the loss of sight for the purposes of R.C. 4123.57(B).
{¶ 33} Second, the majority’s decision erects a hurdle for the injured worker that is not mandated by the statute or by our precedent. The majority concludes that Baker is not entitled to compensation, because vision tests never demonstrated a loss of at least 25 percent of his sight. But we do not need test results to tell us that Baker can no longer see through the injured eye without the benefit of his corrective replacement lens. This is an undeniable fact. We can be hopeful that Baker’s corrective procedure is permanently successful, but we must be mindful that new medical technologies sometimes fail and that our bodies do not always comply with doctors’ plans. Moreover, regardless of the lens implant’s success, the workplace injury deprived Baker of the irreplaceable wonder of his natural eyesight.
{¶ 34} The employer suggests that to allow Baker to receive workers’ compensation benefits for total vision loss will result in a windfall to him. Such an argument misses the point. Baker sustained the loss of his natural eye lens due to a workplace injury, and the General Assembly has determined that such harm is compensable.
{¶ 35} This appeal presents unresolved questions for the legislature. The court, however, should not be making new law. Had Baker waited until his natural lens was opaque, the majority would find that he is entitled to compensation; therefore, from the majority opinion today, we will apparently require that injured workers wait until a cataract caused by a workplace injury obscures sight before undergoing corrective surgery. In other words, injured workers seeking compensation to which they are entitled must choose between following doctors’ orders or receiving compensation for workplace injuries that undeniably wrecked their eyesight. The result we reach today will require injured workers to consult lawyers before they decide on appropriate medical treatment.
*146 Gallon, Takacs, Boissoneault & Schaffer Co., L.P.A., and Theodore A. Bowman, for appellant Baker.
Michael DeWine, Attorney General, and Colleen C. Erdman, Assistant Attorney General, for appellant Industrial Commission of Ohio.
Reminger Co., L.P.A., Amy S. Thomas, and Mick Proxmire, for appellee.
{¶ 36} Baker, because of a workplace injury, lost sight in his right eye. Yet because he followed his doctor’s orders and had a replacement lens implanted before the injury completed its damage, the majority will deprive him of compensation. We should not create an incentive for injured workers to delay necessary medical treatment, nor should we pretend that a replacement lens is as good as the original. Instead of producing this unfortunate result, we should treat Baker like any other worker who loses the sight of an eye. Therefore, I dissent.
O’Connor, C.J., and Pfeifer, J., concur in the foregoing opinion.