[Cite as *State ex rel. Cogan v. Indus. Comm.*, 2022-Ohio-3748.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Kenneth E. Cogan, | : | |
| Relator, | : | |
| v. | : | No. 21AP-9 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on October 20, 2022

**On brief:** *Spears & Marinakis, LLC,* and *David R. Spears*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Cindy Albrecht,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, P.J.

{¶ 1} Relator, Kenneth E. Cogan, initiated this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying Cogan's request for payment of a scheduled-loss award for loss of vision in his right eye, pursuant to R.C. 4123.57(B), and to enter an order granting such compensation. Alternatively, Cogan requests a limited writ of mandamus remanding the case to the commission for future orders consistent with our decision.

{¶ 2}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this court referred the matter to a magistrate of this court.  The magistrate issued the appended decision, including findings of fact and conclusions of law.  The magistrate determined that the commission did not abuse its discretion in concluding Cogan did not undergo pre-injury surgical correction to his vision, and thus the proper measure of his pre-injury vision baseline was his uncorrected vision prior to the workplace injury.  Finding the evidence demonstrated that Cogan's pre-injury uncorrected vision was "count fingers at two feet" and his post-injury vision was "count fingers at two feet," the magistrate determined the commission had some evidence to conclude Cogan's workplace injury resulted in no loss of vision.  Thus, the magistrate recommends this court deny Cogan's request for a writ of mandamus.

{¶ 3}   Cogan has filed objections to the magistrate's decision.  Therefore, we must independently review the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law."  Civ.R. 53(D)(4)(d).  In his objections, Cogan asserts the magistrate erred (1) in failing to construe his childhood injury as including a prior corrective surgical procedure, and (2) in determining Cogan's pre-workplace injury visual baseline for purposes of calculating his loss of sight.

{¶ 4}   A brief summary of the factual circumstances is pertinent to our discussion.  As the magistrate noted, a childhood injury involving a BB pellet left Cogan without a lens in his right eye, a condition referred to as aphakia.  Though Cogan could not provide medical records from the time of the childhood injury, it is undisputed that Cogan's lens was not replaced.  However, through the use of a hard contact lens and glasses, his vision was able to be restored to approximately 20/40.  Without the use of the hard contact lens, Cogan's pre-injury uncorrected vision was "count fingers at two feet." (Mar. 31, 2020 Khalil Raffoul, M.D., Report at 2.)  With the use of the contact lens, Cogan had usable vision in his right eye and was able to maintain a commercial driver's license.

{¶ 5}   Several decades later, on October 20, 2009, Cogan suffered a workplace injury when a ratchet struck his right eye, and his claim was allowed for partial detachment with multiple defects right retina, bullous keratopathy, recent total right retinal detachment, and photosensitivity of the eye.  In the decade following the workplace injury, Cogan's vision fluctuated in response to various attempts to restore and/or correct his

vision. Cogan underwent three surgical procedures as a result of the industrial injury: (1) repair of retinal detachment in December 2009; (2) corneal transplant and removal and breaking of iris adhesions in July 2011; and (3) a secondary corneal transplant, anterior vitrectomy, and implantation of a secondary intraocular lens in December 2019. Prior to his most recent surgery in December 2019, Cogan's uncorrected visual acuity in his right eye was measured at "count fingers at two feet." (Dr. Raffoul Report at 2.) Following the most recent surgery, Cogan's best corrected vision in the right eye was measured at 20/400 in January 2020. His treating physician, Woodford VanMeter, M.D., further found on February 27, 2020 that Cogan does not have "usable vision" in his right eye because of refractive error.

{¶ 6} On March 17, 2020, Cogan filed a request for "payment of compensation pursuant to [R.C.] 4123.57(A) for One Hundred Percent (100%) loss of pre-injury vision in the right eye." The district hearing officer denied Cogan's motion, finding Cogan failed to satisfy his burden of proof. Cogan appealed, and the staff hearing officer ("SHO") affirmed the denial of Cogan's motion. Relying on the report of Khalil Raffoul, M.D., the SHO found that because R.C. 4123.57(B) required a comparison of pre-injury uncorrected vision to post-injury uncorrected vision, Cogan could not show that he suffered any loss of vision due to the industrial injury.

{¶ 7} To be entitled to a writ of mandamus, Cogan must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76, 78-79 (1986). But when the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56, 58 (1987).

{¶ 8} In reviewing a claim for a writ of mandamus in a workers' compensation case, the court's role is to determine whether the commission abused its discretion. *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, ¶ 8, citing *State ex rel. Packaging Corp. of Am. v. Indus. Comm.*, 139 Ohio St.3d 591, 2014-Ohio-2871, ¶ 29. "The

commission is the exclusive finder of fact and has sole responsibility to evaluate the weight and credibility of the evidence." *Id.*, citing *State ex rel. Perez v. Indus. Comm.*, 147 Ohio St.3d 383, 2016-Ohio-5084, ¶ 20.

{¶ 9} The dispute here relates to the commission's denial of Cogan's application for a scheduled-loss award for the loss of sight of his right eye. R.C. 4123.57(B) governs payment for the loss of certain body parts or functions as result of workplace injuries. More specifically, R.C. 4123.57(B) allows for payment to injured workers of the statewide average weekly wage for a scheduled number of weeks for loss of use, including, as relevant here:

> For the loss of the sight of an eye, one hundred twenty-five weeks.
>
> For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision.

R.C. 4123.57(B).

{¶ 10} Thus, " '[w]hen an injured worker applies for a scheduled-loss award, "[t]he question under R.C. 4123.57(B) is whether a claimant has suffered loss of sight or partial loss of sight." ' " *Beyer* at ¶ 10, quoting *State ex rel. Baker v. Coast to Coast Manpower, L.L.C.*, 129 Ohio St.3d 138, 2011-Ohio-2721, ¶ 20 (plurality opinion), quoting *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, ¶ 18. Where the claim is for partial loss of sight, the statutory standard to measure such partial loss is "the percentage of vision actually lost as a result of the injury." R.C. 4123.57(B); *Beyer* at ¶ 10. A claimant alleging partial loss of sight must "submit medical evidence showing the degree of his visual impairment," and that evidence must include "a physician's determination of the percentage of vision lost." *Beyer* at ¶ 13, 16 (finding it was not enough for a claimant to present his raw visual-acuity values in the form of Snellen fractions; instead, those values must be accompanied by a physician's determination of the degree of impairment).

{¶ 11} On the other hand, a claim for an award for the *total* loss of sight of an eye is not necessarily dependent on the percentage of vision loss and may instead be demonstrated by proof of legal blindness. *Beyer* at ¶ 18 (finding the provision of R.C.

4123.57(B) for the total "loss of sight of an eye" is a claim made "regardless of the percentage of vision lost"). Where a claimant seeks an award for the total loss of sight of an eye based on a demonstration of legal blindness resulting from the injury, "the commission properly [grants] R.C. 4123.57(B) awards without medical evidence showing a physician's determination of the percentage of vision lost." *Beyer* at ¶ 18, citing *AutoZone* at ¶ 20-22, and *State ex rel. Lay-Z-Boy Furniture Galleries v. Thomas*, 10th Dist. No. 08AP-827, 2009-Ohio-5456, ¶ 50 ("*La-Z-Boy I*"), *aff'd sub nom., State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215 ("*La-Z-Boy II*").[1] *See also AutoZone* at ¶ 18 ("pursuant to R.C. 4123.57(B), when a doctor determines that a claimant is rendered 'legally blind' due to the loss of a lens in an industrial accident, that determination constitutes 'some evidence' that the claimant has suffered 'the loss of the sight of an eye' pursuant to R.C. 4123.57(B)").

{¶ 12} Regardless of whether a claimant seeks compensation for partial or total vision loss, establishing the appropriate pre-injury visual baseline is critical to determining whether and to what extent vision was lost. In many circumstances, the determination of partial loss of vision involves a comparison of the pre-injury uncorrected visual acuity baseline compared to the post-injury uncorrected visual acuity and the physician's resulting determination of impairment stemming therefrom. *See, e.g., Beyer* at ¶ 3 (evidence in the record demonstrated claimant's pre-injury visual acuity was 20/20 while his post-injury visual acuity was 20/100). Indeed, there may be situations in which, even for claims of total loss of sight, the appropriate analytical starting point involves the comparison of uncorrected pre- and post-injury vision as typically applied to claims of partial loss of sight. *See Baker* at ¶ 22 ("[a]t no time following his injury did Baker's 'loss of uncorrected vision' reach the statutory threshold of 25 percent. It follows that he was unable to establish a total loss of sight"). However, the Supreme Court of Ohio has found that, in certain situations, "a claimant's uncorrected preinjury vision may not always be the best baseline from which to determine the amount of postinjury loss." *La-Z-Boy II* at ¶ 18. The question presented here is whether the commission abused its discretion in determining Cogan's pre-injury

---

[1] We recognize that the spelling of the party name and case caption differs slightly from *La-Z-Boy I* to *La-Z-Boy II*. However, for ease of discussion, we use a shorthand designation where both case names are spelled the same and are distinguished, instead, by the roman numeral.

visual baseline to be his uncorrected pre-injury vision of "count fingers at two feet," or whether, as Cogan contends, the appropriate baseline was the 20/40 vision he could achieve with the use of his hard contact lens.

{¶ 13} At the outset, Cogan disagrees with the commission's, and subsequently the magistrate's, factual determination that he did not undergo surgical correction to his visual acuity as a result of his childhood injury. Cogan admits he does not have the medical records related to that injury, but he asserts the fact that his natural lens was removed should be deemed as surgical correction as it allowed him to use the hard contact lens, and asserts his visual baseline should therefore be his vision as corrected with the hard contact lens. A review of the record indicates, however, that Cogan misstates the commission's finding in this regard. The commission did not find, definitively, that Cogan did not undergo surgical correction to his vision as a child; rather, the commission found that Cogan presented uncertain testimony on this point, noting that Cogan could not recall whether or not he underwent lens transplantation surgery as a child. The commission additionally noted the report of Devin King, M.D., from 2012 indicating that Cogan likely did not undergo surgical correction to vision before the workplace injury. As noted above, it is the commission's role to evaluate the weight and credibility of the evidence, and the commission is the exclusive finder of fact. *Perez* at ¶ 20. Thus, the commission found it would consider Cogan's pre-injury baseline as though Cogan had not had pre-injury corrective surgery. There was some evidence in the record to support the commission's finding in this regard, and we therefore overrule Cogan's first objection to the magistrate's decision.

{¶ 14} Though he frames his first objection as relating to the magistrate's findings of fact, in practice both of Cogan's objections are interrelated: they assert the magistrate erred in the application of *La-Z-Boy I* to the circumstances of this case. Both the commission and the magistrate determined Cogan's case was factually distinct from *La-Z-Boy I* because Cogan did not undergo pre-injury surgical correction to improve his visual acuity and, on that basis, found *La-Z-Boy I* did not apply. Even though we overrule Cogan's objection to the finding of facts related to whether he underwent prior *surgical* correction, we nevertheless find Cogan's prior *medical* history is relevant to his visual baseline. For

the reasons that follow, we agree with Cogan that the commission and the magistrate interpreted *La-Z-Boy I* too narrowly.

{¶ 15} The claimant in *La-Z-Boy I* underwent a corneal transplant approximately one year prior to his industrial injury that corrected his vision from 20/200 to 20/50. Following his industrial injury, claimant's uncorrected visual acuity was 20/200. This court determined the commission acted within its discretion in using claimant's 20/50 corrected pre-injury vision as the baseline for determining his loss of vision claim and granted the claimant's requested writ of mandamus ordering the commission to award him compensation for total loss of sight in his left eye. *La-Z-Boy I* at ¶ 11-12. We further noted "[i]t would seem unfair to allow a loss of vision award to an injured worker who had a 'natural' functioning eye prior to [the] date of injury but not to an individual who had a functional eye only as the result of a previous medical procedure which was able to restore functionality to the eye." *La-Z-Boy I* at ¶ 11.

{¶ 16} In affirming the *La-Z-Boy I* decision, the Supreme Court in *La-Z-Boy II* noted "the desirability of affording the commission some discretion in establishing a claimant's preinjury visual baseline." *La-Z-Boy II* at ¶ 20 (also stating that "[e]ven when preinjury correction does not significantly precede the industrial injury, we can foresee situations in which the appropriate measure of preinjury vision could require a more flexible approach").

{¶ 17} Unlike the commission and the magistrate, we do not construe either this court's decision in *La-Z-Boy I* or the Supreme Court's decision in *La-Z-Boy II* as being limited to only cases in which the claimant underwent pre-injury surgical correction to his or her vision. More broadly, where the prior visual history of an injured worker is relevant to determining whether and to what extent an injured worker has suffered a loss of sight as a result of an industrial injury, *La-Z-Boy II* directs that the commission can, and should, exercise discretion in determining the injured worker's pre-injury visual baseline. *La-Z-Boy II* at ¶ 18 ("a claimant's uncorrected preinjury vision may not always be the best baseline from which to determine the amount of postinjury loss"). Thus, even if Cogan cannot demonstrate prior surgical correction to his vision, the commission still has discretion to consider the unique facts of Cogan's visual and medical history.

{¶ 18}  Within that context, we recognize that the report of Dr. Raffoul, the reviewing physician, found that Cogan did not suffer "any significant loss of visual acuity in the right eye" because "[t]he *uncorrected* vision remained at count fingers at [two] feet."  (Emphasis added.)  (Dr. Raffoul Report at 2.)  This response, however, must be understood in the context in which the question was posed.  Dr. Raffoul answered the question as it was presented to him on the form provided by the Bureau of Workers' Compensation directing Dr. Raffoul to determine Cogan's pre-injury *uncorrected* visual acuity.  In so instructing, the commission pre-determined that Cogan's pre-injury uncorrected vision was the appropriate baseline without accounting for the circumstances unique to that case.  To ignore the practical reality of Cogan's visual history in favor of a hardline adherence to a standard of uncorrected pre-injury vision compared to uncorrected post-injury vision betrays both the discretion afforded to the commission in *La-Z-Boy I and La-Z-Boy II* and the statutory principle that the workers' compensation statutes are to be liberally construed in favor of the injured worker.  R.C. 4123.95 (the workers' compensation statutes "shall be liberally construed in favor of employees").

{¶ 19} We  agree  with  Cogan,  therefore,  that  the  commission  erred  in  its determination of Cogan's pre-injury baseline.  It is undisputed here that despite Cogan's injury, through the use of a hard contact lens he was able to see with 20/40 to 20/50 vision in his right eye from the time he was eight years old until just prior to the industrial injury. Following the industrial injury, the submitted medical evidence demonstrated Cogan was left without usable vision in his right eye, and even his best *corrected* vision in his right eye was 20/400.  In other words, prior to the industrial injury Cogan had usable vision in his right eye; after the industrial injury, he did not.  Further, Dr. Raffoul found that Cogan's post-injury visual acuity of 20/400 in the right eye, or "worse than legally blind," is "related to all of the allowed conditions including retinal detachment and bullous keratopathy which later required retinal detachment repair and corneal transplant." (Dr. Raffoul Report at 2.) However, it is not for this court to determine, in the first instance, whether the submitted medical evidence supports an award for loss of vision compensation.  Instead, because the commission applied the wrong standard to determine Cogan's pre-injury visual baseline, we remand this matter to the commission to (1) exercise the discretion afforded to it to determine the appropriate pre-injury visual baseline, and (2) use the updated pre-injury

visual baseline to determine whether the medical evidence supports an award for loss of vision compensation under R.C. 4123.57(B).

{¶ 20} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate erred in determining Cogan is not entitled to the requested limited writ of mandamus. Accordingly, we adopt the magistrate's findings of fact but not the conclusions of law. We therefore overrule Cogan's first objection to the magistrate's decision but sustain his second objection to the magistrate's decision. For the reasons set forth herein, we grant Cogan's request for a limited writ of mandamus, and we remand this matter to the commission for further proceedings in accordance with this decision.

*Objections overruled in part and sustained in part;*
*limited writ of mandamus granted; cause remanded.*

SADLER and MENTEL, JJ., concur.

———————————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Kenneth E. Cogan,          :

     Relator,                                    :

v.                                                       :                    No. 21AP-9

Industrial Commission of Ohio et al.,     :                    (REGULAR CALENDAR)

     Respondents.                           :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on May 18, 2022

---

*Spears & Marinakis, LLC,* and *David R. Spears*, for relator.

*Dave Yost*, Attorney General, and *Cindy Albrecht,* for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

**{¶ 21}** Relator, Kenneth E. Cogan ("claimant"), has filed this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that denied claimant's request for payment of a scheduled-loss award for loss of use of vision in his right eye, pursuant to R.C. 4123.57(B), and to enter an order granting such compensation.

Findings of Fact:

**{¶ 22}** 1. The claimant was injured on October 20, 2009, in the course of and arising from his employment with respondent, Cogans Wrecker Service Inc. ("employer"),

when a ratchet slipped off a bolt and struck his right eye. The claim was allowed for partial detachment with multiple defects right retina, bullous keratopathy, recent total right retinal detachment, and photosensitivity right eye.

{¶ 23} 2. When claimant was a child, a BB pellet struck his right eye. There are no records available from the time of that injury. However, the medical records in the present case document that, as a result of the BB-pellet injury, claimant lacks a lens in his right eye, which is referred to as "aphakia." Claimant's lens was not replaced, but his vision was restored to approximately 20/40 with the use of a hard contact lens and glasses.

{¶ 24} 3. In a December 10, 2009, operative report, John Kitchens, M.D., reported claimant had a lensectomy when he was young and had 20/40 vision in his right eye with correction of a contact lens. Upon referral, claimant had visual acuity of "hand motions at three feet."

{¶ 25} 4. In a July 21, 2010, note, Dr. Richard A. Tam, M.D., reported claimant had pre-existing aphakia and cataract surgery 50 years ago, but admitted he had no prior medical records.

{¶ 26} 5. In a January 27, 2012, note, Devin A. King, M.D., reported claimant had traumatic aphakia pre-injury and was apparently seeing 20/40 to 20/50 with contact lens prior to the industrial injury. His best corrected visual acuity was 20/150.

{¶ 27} 6. In a December 21, 2013, report, Carl F. Asseff, M.D., reported claimant had corneal repair surgery and a lensectomy as a child.

{¶ 28} 7. In a September 18, 2018, Independent Medical Examination report, Marshall Wareham, M.D., reported claimant had cataract surgery without an inner ocular lens at six years old. His uncorrected vision before the industrial injury was "count fingers at 2-3 feet," and his best corrected vision with hard contact lens was 20/40 to 20/50. His vision after multiple surgeries was in the range of 20/400 or worse. His uncorrected vision in his right eye was 20/300, but it varied. He was aphakic in the right eye. Dr. Wareham opined that there was no loss of uncorrected vision related to the injury. Claimant's best corrected vision was 20/200 or worse.

{¶ 29} 8. Claimant underwent three surgeries as a result of the current industrial injury to the right eye: (1) repair of retinal detachment; (2) corneal transplant and removal and breaking of iris adhesions; and (3) penetrating keratoplasty, anterior vitrectomy, and

implantation of chamber lens. Claimant's best corrected vision in the right eye currently is 20/125, according to the February 27, 2020, note of Woodford Van Meter, M.D. Prior to the most recent surgery, his best corrected vision in the right eye was 20/200.

{¶ 30} 9. On March 17, 2020, claimant filed a request for compensation for total loss of vision in the right eye.

{¶ 31} 10. The Ohio Bureau of Workers' Compensation ("BWC") requested a file review, and Khalil A. Raffoul, M.D., issued a report on March 31, 2020, finding, in pertinent part, the following: (1) the most recent exam preceding the injury that was able to be reviewed was from October 21, 2001, and at that exam uncorrected visual acuity in the right eye was "count fingers at two feet"; (2) after all procedures were completed, the most recent visual acuity recorded in 2019 prior to his last surgery uncorrected was also "count fingers at two feet" in the right eye; (3) following his most recent surgery, there is no record of uncorrected visual acuity in the right eye, but the corrected visual acuity postoperatively in January 2020 was 20/400 corrected in the right eye; (4) the injury that resulted in a retinal detachment and subsequent repair did not result in any significant loss of uncorrected visual acuity in the right eye, and the uncorrected visual remained at "count fingers at two feet"; and (5) the corrected visual acuity in the right eye is 20/400, which would be worse than the legally blind 20/200 in the right eye, and that is related to all the allowed conditions, including retinal detachment and bullous keratopathy, which later required retinal detachment repair and corneal transplant.

{¶ 32} 11. On June 30, 2020, a hearing on claimant's motion was held before a district hearing officer ("DHO"). In an order mailed July 9, 2020, the DHO found the following: (1) claimant's motion for total loss of vision in the right eye is denied; (2) there is insufficient persuasive evidence to grant the award; and (3) the DHO relies upon the March 31, 2020 report of Dr. Raffoul, and claimant's failure to meet his burden of proof. Claimant appealed.

{¶ 33} 12. A hearing was held on claimant's appeal before a staff hearing officer ("SHO"), and on September 5, 2020, the SHO issued an order, in which the SHO found the following: (1) claimant's motion for loss of vision is denied, and the order of the DHO is affirmed; (2) the claim is complicated by the fact that as a child claimant suffered an injury to his right eye from a BB pellet; (3) claimant worked successfully as a wrecker

driver with a commercial driver's license for many years before he suffered the present industrial injury to his right eye; (4) claimant initially suffered a partial retinal detachment; (5) claimant has undergone numerous surgical procedures to address the injuries to the allowed conditions; (6) per R.C. 4123.57(B), an award for loss of vision must be based on the percentage of vision actually lost as a result of the industrial injury, and it cannot be made for less than a 25 percent loss of uncorrected vision; (7) the loss of uncorrected vision is defined in the statute as the percentage of vision actually lost as the result of the injury; (8) thus, a comparison is made between an injured worker's uncorrected vision in the eye before the date of injury and the uncorrected vision in the eye post-injury; (9) the BWC instructs examining physicians that:

> 'Pre-injury uncorrected visual acuity' means the injured worker's visual acuity before the injury, without correction by glasses or contacts. However, if a surgical correction has been performed preinjury you should not discount the improvement gained from this surgery. You should use the injured worker's visual acuity after recovery from this surgical correction. You should still discount any improvement provided by the correction through the use of lenses or contacts.

(10) the reference in these instructions to surgical correction of pre-injury visual acuity is the basis for the holding in *State ex rel. Lay-Z-Boy Furniture Galleries v. Thomas*, 10th Dist. No. 08AP-827, 2009-Ohio-4546, *affirmed* in *State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215 (both cases generally referred to as "*Lay-Z-Boy*"), filed by the injured worker; (11) the key inquiry then is whether there is medical evidence to establish the injured worker had surgical correction of his pre-injury eye, and, if so, what his vision was immediately prior to the industrial injury to the same eye; (12) claimant provided testimony of multiple surgical procedures he has had, both as a child and since the industrial injury; (13) claimant cannot recall whether he underwent lens transplantation after the BB-pellet injury and before the industrial injury; (14) there are references to corneal transplants when claimant was a child; (15) the SHO could not locate any information to confirm that claimant had a lens transplantation procedure before the industrial injury; (16) based on the history outlined by Dr. King in his January 27, 2012, report, claimant most likely did not have such surgical correction to

his vision before the injury; (17) Dr. King references in his report that as a result of the BB-pellet injury, claimant suffered traumatic aphakia and traumatic glaucoma and that he had corrected vision from 20/40 to 20/50 in the right eye with contact lenses prior to the industrial retinal detachment; (18) thus, the starting standard to compare the loss of vision secondary to the industrial injury is the injured worker's pre-injury vision, which was compromised because of his prior injury and is described in the records as acuity of "count fingers at two feet"; (19) according to Dr. Raffoul, in his March 31, 2020, report, before undergoing the most recent procedure on December 4, 2019, claimant remained with uncorrected vision "count fingers at two feet"; (20) given the pre-injury vision was "count fingers at two feet" and remained at this level following the industrial retinal detachment, Dr. Raffoul opined there is no loss of uncorrected visual acuity in the right eye; and (21) based on this opinion, the SHO denied claimant's request for compensation under R.C. 4123.57(B) for loss of vision of the right eye.

{¶ 34} 13. Claimant filed an appeal, which was refused by the commission in a September 24, 2020, order.

{¶ 35} 14. Claimant filed a request for reconsideration, which the commission denied in a November 20, 2020, order.

{¶ 36} 15. On January 6, 2021, claimant filed a complaint for writ of mandamus requesting that this court order the commission to grant his motion for loss of use award.

Conclusions of Law and Discussion:

{¶ 37} The magistrate recommends that this court deny claimant's request for a writ of mandamus.

{¶ 38} In order for this court to issue a writ of mandamus, a relator must ordinarily show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 39} A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's

findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 40} R.C. 4123.57(B) authorizes scheduled compensation to a claimant for the total loss of a body part, such as the total loss of an arm, leg, ear, or eye. "Loss" within the meaning of the statute includes not only amputation, but also the loss of use of the affected body part. *State ex rel. Wyrick v. Indus. Comm.*, 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10, citing *State ex rel. Moorehead v. Indus. Comm.*, 112 Ohio St.3d 27, 2006-Ohio-6364, ¶ 13. An injured worker claiming loss of use under R.C. 4123.57(B) bears the burden of showing that the loss of use is complete and permanent. *State ex rel. Carter v. Indus. Comm.*, 10th Dist. No. 09AP-30, 2009-Ohio-5547. R.C. 4123.57(B) provides, in pertinent part:

> In cases included in the following schedule the compensation payable per week to the employee is the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code per week and shall be paid in installments according to the following schedule:
>
> * * *
>
> For the loss of the sight of an eye, one hundred twenty-five weeks.
>
> For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.

{¶ 41} Memo F2 of Adjudications Before the Industrial Commission ("Memo F2"), entitled Loss of Vision—Corneal Transplants and Corneal Implants, provides:

> The improvement of vision resulting from a corneal transplant or corneal implant is a correction of vision and shall not be taken into consideration in determining the

percentage of vision actually lost pursuant to R.C. 4123.57(B). The proper measure for loss of vision is the percentage of vision actually lost when comparing the pre-injury vision to the post-injury vision, prior to any corrective treatment. However, if the result of the attempted corrective procedure is that the vision has worsened, that fact may be taken into account when making an award.

{¶ 42} In the present case, claimant argues the commission made a mistake of fact and a mistake of law. As for the mistake of fact, claimant argues that the SHO specifically found there was no information to confirm that claimant had surgical correction to his vision prior to the industrial injury, but this finding is incorrect, as there are numerous references to a prior lensectomy throughout the record, including in the December 10, 2009, operative report of Dr. Kitchens; the January 27, 2012, note of Dr. Kind; the July 21, 2010, note of Dr. Tam; the September 18, 2018, report of Dr. Wareham; and the December 21, 2013, report of Dr. Asseff.  Claimant states that although the removal of the natural lens resulted in significant visual loss, the subsequent surgery to repair the injury restored function of the eye, and with a contact lens, resulted in normal vision.  As for the mistake of law, claimant argues that *Lay-Z-Boy* is nearly factually identical to the present case, and this court held in that case that when an individual has a non-work-related medical condition that affects the eye, and the non-work-related condition was surgically addressed and resulted in an improvement to visual acuity, the proper standard for a comparison in a vision-loss claim would be the best *corrected* visual acuity prior to an industrial injury versus the *uncorrected* visual acuity postindustrial injury. Claimant asserts that, in the instant case, prior to the industrial injury, claimant's lens was surgically removed when he was a youth, and his visual acuity was "count fingers at two feet," but his vision was 20/40 after corrected with a contact lens and glasses. Following the industrial injury and three surgical procedures, claimant asserts his visual acuity had worsened to 20/400, even with correction, resulting in no useful vision due to refractive error, according to the medical records. Thus, according to Memo F2, because claimant's vision has worsened post-injury, that fact should have been considered by the commission when comparing pre-injury vision to post-injury vision.

{¶ 43} With regard to claimant's argument that the commission made a mistake of fact—the SHO incorrectly found there was no information to confirm that claimant had surgical correction to his vision prior to the industrial injury—the magistrate disagrees. Contrary to claimant's contention, the SHO never found there was no information to confirm that claimant had surgical correction to his vision prior to the industrial injury. The SHO acknowledged that claimant provided testimony of multiple surgical procedures he had as a child, claimant cannot recall whether he underwent lens transplantation after the BB-pellet injury and before the industrial injury, and there are references in the record to corneal transplants when claimant was a child. However, the SHO then found that she could not locate any information to confirm that claimant had a lens transplantation procedure before the industrial injury, and Dr. King concluded that claimant most likely did not have "such surgical correction" (i.e., the lens transplantation procedure referred to in the prior sentence) to his vision before the injury. Thus, the SHO's actual finding was that there was no information to confirm that claimant had a preinjury lens transplantation procedure. The reports of Drs. Kitchens, Kind, Tam, Wareham, and Asseff, as cited by claimant, do not conflict with the SHO's conclusion. Dr. Kitchens reported claimant had a lensectomy when he was young. Dr. King reported that claimant had traumatic aphakia preinjury. Dr. Wareham reported that claimant had cataract surgery without an inner ocular lens at eight years old. Dr. Asseff reported that claimant had corneal repair surgery and a lensectomy as a child. Dr. Tam reported that claimant had preexisting aphakia and cataract surgery 50 years ago. Thus, none of the medical reports cited by claimant indicate he had a lens transplantation procedure, which is what the SHO also concluded. Furthermore, although some of the cited doctors did indicate that claimant underwent at least some surgeries as a child, there is nothing in the record to "confirm" such, beyond claimant's self-reported history. It is undisputed that there are no medical records from claimant's childhood to buttress his claims regarding which and how many surgeries he had as a child, and the resulting visual acuity based upon those surgeries. In addition, although claimant seems to argue that his acknowledged aphakia constituted a surgical correction to his vision, he does not explain how the removal of the lens corrected his vision or restored functioning of the eye. Therefore, the magistrate can find no error in the commission's factual finding, in this respect.

{¶ 44} With regard to the mistake of law, claimant argues that *Lay-Z-Boy* is nearly factually identical to the present case, and the commission should have followed it to award a loss of vision. However, a review of *Lay-Z-Boy* reveals that it is not factually identical to the present case. In *Lay-Z-Boy*, the claimant had a corneal transplant in his left eye in 2005. Before the transplant, the claimant's left-eye vision was 20/200. After the transplant, his left eye refracted vision was 20/50. In 2006, the claimant injured his left eye, losing the transplanted cornea, while working for the employer. After the industrial accident, the vision in his left eye returned to 20/200. A corneal implant was then inserted into the damaged eye, and his vision returned to 20/50 without glass correction. In 2007, the claimant filed a motion seeking scheduled-loss compensation for total loss of vision in his left eye. A DHO issued an order awarding claimant the requested compensation. An SHO affirmed the DHO's finding that a loss of vision had occurred. The commission denied the appeals from the SHO's order. In mandamus, the employer asserted that because the claimant's uncorrected vision was 20/200 both before and after the injury, no loss had occurred. The magistrate concluded, in pertinent part, that the proper baseline for determining vision loss in this case was the improved visual acuity of 20/50 the claimant enjoyed as a result of the corneal transplant in his left eye. The magistrate concluded that the claimant's improved vision resulting from the corneal transplant could be used as the baseline to determine vision loss, because to do otherwise would result in a non-allowed condition that caused the claimant's impaired vision prior to the corneal transplant being used to defeat the claimant's claim that he lost vision as a result of the industrial accident, which is prohibited. Upon objections, the appellate court agreed with the DHO that it would seem unfair to allow a loss of vision award to an injured worker who had a "natural" functioning eye prior to the date of injury but not to an individual who had a functional eye only as the result of a previous medical procedure that was able to restore functionality to the eye. Thus, the court found that the proper baseline for determining the claimant's vision loss was the claimant's visual acuity after the corneal transplant.

{¶ 45} On appeal to the Supreme Court of Ohio, the court affirmed the court of appeals. The litigants agreed that the claimant's postinjury corneal implant must be excluded from consideration, meaning that his postinjury vision for R.C. 4123.57(B)

purposes was 20/200. However, with regard to the claimant's preinjury baseline vision, the commission and court expressed concern about situations in which the preinjury correction significantly predates the industrial injury. The court explained that, had the claimant's corneal transplant occurred in 1985 rather than 2005, for example, he would have had 20/50 vision not for just one, but for 21 years prior to his industrial accident, and it would be unfair to measure the preinjury vision as 20/200 that the claimant had as a child in 1985, rather than the 20/50 vision that he enjoyed for over two decades. The court acknowledged that, even when preinjury correction does not significantly precede the industrial injury, there could be situations in which the appropriate measure of preinjury vision could require a more flexible approach; most obviously, in a situation in which glasses or contact lenses are used to further correct a surgical correction. The court noted that in its case, the record was silent as to whether the claimant used glasses to correct his preinjury 20/50 vision to 20/20, and, if he did, his 20/200 vision would seem largely irrelevant because his glasses would have been refracted to correct 20/50 vision, not 20/200 vision. The court found that the presence of what effectively are two corrections supports the desirability of affording the commission some discretion in establishing a claimant's preinjury visual baseline. The court concluded the commission did not abuse its discretion in using claimant's 20/50 vision as the measure of his preinjury visual acuity and affirmed the judgment of the court of appeals.

{¶ 46} In the present case, the commission, as mentioned above, considered claimant's preinjury surgical history and found no evidence that he had undergone a lens transplantation and, thus, most likely, did not have any preinjury surgical correction. Thus, claimant's only preinjury vision correction was via a hard contact lens, which, pursuant to the BWC's instructions given to doctors, is not considered when measuring preinjury visual acuity. Having found claimant underwent no preinjury surgical correction, the proper preinjury vision baseline would be "count fingers at two feet," and his postinjury vision would be "count fingers at two feet," resulting in no loss of vision. The present facts are unlike those in *Lay-Z-Boy*. In *Lay-Z-Boy*, the preinjury condition was surgically corrected to improve visual acuity, while in the present case there was no preinjury surgical correction. Memo F2 is also not applicable to the present case, as claimant's vision did not worsen after his injury and subsequent surgeries—both his

preinjury and postinjury vision was "count fingers at two feet." Therefore, the magistrate finds the commission relied upon some evidence in denying claimant's loss of use request, and it did not abuse its discretion.

**{¶ 47}** Accordingly, it is the magistrate's decision that this court should deny claimant's petition for writ of mandamus.

/S/ MAGISTRATE
THOMAS W. SCHOLL III

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).