[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cogan v. Indus. Comm.*, Slip Opinion No. 2023-Ohio-3567.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-3567

THE STATE EX REL. COGAN, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cogan v. Indus. Comm.*, Slip Opinion No. 2023-Ohio-3567.]

*Workers' compensation—Scheduled-loss compensation—Industrial Commission has discretion to use a claimant's vision as corrected by hard contact lens as claimant's preinjury visual baseline—Court of appeals' judgment granting limited writ and remanding matter to Industrial Commission affirmed.*

(No. 2022-1469—Submitted May 16, 2023—Decided October 5, 2023.)

APPEAL from the Court of Appeals for Franklin County,

No. 21AP-9, 2022-Ohio-3748.

_____

**Per Curiam.**

{¶ 1} Appellee, Kenneth E. Cogan, seeks scheduled-loss compensation under R.C. 4123.57(B) for the total loss of sight of his right eye. Appellant, Industrial Commission of Ohio, denied Cogan's request, concluding that he had not experienced a postinjury loss of uncorrected vision. Cogan then sought a writ of mandamus from the Tenth District Court of Appeals. The Tenth District issued a limited writ and remanded the matter to the commission, ordering it to determine Cogan's appropriate preinjury visual baseline and to apply that baseline to his request for compensation. The commission appealed.

{¶ 2} At issue is whether the commission has discretion to use a claimant's vision as corrected by a hard contact lens as the claimant's preinjury visual baseline. *See State ex rel. La-Z-Boy Furniture Galleries v. Thomas*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545. We answer that question in the affirmative and affirm the Tenth District's judgment.

## I. BACKGROUND

### A. Visual Acuity

{¶ 3} Visual acuity is one of several "vision" components. *State ex rel. Bowman v. Indus. Comm.*, 170 Ohio St.3d 270, 2022-Ohio-233, 211 N.E.3d 1167, ¶ 14. "Visual acuity 'describes the ability of the eye to perceive details' * * * [and is] usually stated in terms of a Snellen fraction, e.g., 20/20. A Snellen fraction reports the result of a test in which a patient reads letters from a chart positioned some distance away." (Citation omitted.) *State ex rel. Beyer v. Autoneum N. Am.*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, ¶ 4, quoting American Medical Association ("AMA"), *Guides to the Evaluation of Permanent Impairment* 280 (5th Ed.2001). "The numerator in a 20/xx Snellen fraction represents the distance in feet from the patient to the chart, and the denominator represents the distance at which an eye with 20/20 vision would see the smallest letter discerned

by the patient." *Id.*, citing AMA, *Guides to the Evaluation of Permanent Impairment* 210 (4th Ed.1993).

{¶ 4} Visual acuity of 20/200 or less, with correction, is consistent with "legal blindness" under Ohio law. *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, ¶ 22-24, citing R.C. 3304.28(B)(1) (defining "blind" as "[v]ision twenty/two hundred or less in the better eye with proper correction") and *State ex rel. Nastuik v. Indus. Comm.*, 145 Ohio St. 287, 292, 61 N.E.2d 610 (1945) (visual acuity of 20/200 or less is the accepted standard of legal blindness, as reported by the AMA's Committee on Visual Economics).

### B. Factual and Procedural History

{¶ 5} A childhood injury and subsequent lensectomy (surgical removal of the natural lens of the eye) left Cogan without a lens in his right eye, a condition referred to as aphakia. Cogan's use of a hard contact lens in his right eye corrected his visual acuity in that eye to 20/40, and he wore eyeglasses, enabling him to maintain a commercial driver's license for many years. Without correction, the visual acuity in Cogan's right eye was recorded as "count fingers" and "hand motions" at two to three feet, meaning that Cogan could count fingers or perceive hand motions when positioned two to three feet away but that he could not see any letters on the Snellen chart.

{¶ 6} In October 2009, decades after his childhood injury, Cogan sustained an industrial injury to his right eye while employed as a wrecker driver. The Bureau of Workers' Compensation initially allowed Cogan's claim for partial detachment of the right retina with multiple defects, followed by total right retinal detachment, bullous keratopathy, and photosensitivity of the right eye. The bureau disallowed his claim for the preexisting condition of aphakia.

{¶ 7} Cogan underwent three surgical procedures to address the conditions allowed under his claim: retinal detachment repair in December 2009, corneal

transplant in July 2011, and corneal transplant with secondary intraocular lens implantation in December 2019.

**{¶ 8}** Cogan filed multiple requests for scheduled-loss compensation under R.C. 4123.57. Most recently, in March 2020, Cogan requested compensation "for One Hundred Percent (100%) loss of pre-injury vision in the right eye." Cogan relied on various medical and operative reports from his treating physicians and surgeons that he had submitted with his requests throughout the years. The reports indicate that Cogan's *uncorrected* visual acuity remained unmeasurable by the Snellen chart following the industrial injury—e.g., "hand motions at three feet" prior to the retinal-detachment repair and "finger counting at four feet" prior to the first corneal transplant. Cogan's *corrected* visual acuity, on the other hand, measured considerably worse than the preinjury measurement of 20/40: after the second corneal transplant, his best corrected visual acuity measured 20/400. A handwritten note from his surgeon states that Cogan "does not have usable vision" in the right eye "because of refractive error."[1]

**{¶ 9}** The bureau requested an independent file review from Khalil A. Raffoul, M.D. In Dr. Raffoul's opinion, the industrial injury did not result in any significant loss of *uncorrected* visual acuity, which was recorded as "count fingers at two feet" both before and after the injury. He concluded, however, that Cogan's *corrected* visual acuity of 20/400 after the industrial injury is worse than the legally blind 20/200 level and that the change "is related to all of the allowed conditions including retinal detachment and bullous keratopathy which later required retinal detachment repair and corneal transplant."

**{¶ 10}** A district hearing officer denied Cogan's request for scheduled-loss compensation based on Dr. Raffoul's report, and a staff hearing officer ("SHO") affirmed. The SHO found that R.C. 4123.57(B) requires a comparison between an

---

1. The surgeon's note also reads, "Vision today is 20/125," but it is not apparent whether this is a corrected or uncorrected measurement or even which eye the note describes.

injured worker's preinjury and postinjury uncorrected vision. The SHO noted, however, that the bureau instructs examining physicians to account for improvement gained from preinjury surgical correction but not for improvement gained from preinjury correction through use of eyeglasses or contact lenses. According to the SHO, this instruction was the basis for the opinion in *State ex rel. Lay-Z-Boy Furniture Galleries v. Thomas*, 10th Dist. Franklin No. 08AP-827, 2009-Ohio-4546, *aff'd sub nom. La-Z-Boy*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545, which involved a preinjury corneal transplant. The SHO found that because Cogan's preinjury visual acuity could be corrected with a hard contact lens but that he "most likely did not" have preinjury corrective surgery, the "starting standard to compare the loss of vision" is Cogan's preinjury uncorrected vision of "count fingers at two feet." Thus, based on Dr. Raffoul's opinion that Cogan did not experience a loss of *uncorrected* visual acuity following the industrial injury, the SHO denied Cogan's request for scheduled-loss compensation. The commission denied further administrative review.

{¶ 11} Cogan filed a mandamus action in the Tenth District Court of Appeals, contending that the commission had abused its discretion and misapplied *Lay-Z-Boy* to the facts of his case. The Tenth District found that the medical evidence had demonstrated that prior to the industrial injury, Cogan had "usable vision" in his right eye through use of a hard contact lens but that he was "legally blind" after the injury. 2022-Ohio-3748, 199 N.E.3d 205, ¶ 19. The court concluded that the commission had interpreted *Lay-Z-Boy* too narrowly and "pre-determined that Cogan's pre-injury uncorrected vision was the appropriate baseline without accounting for the circumstances unique to that case." *Id*. at ¶ 14, 18. The court granted a limited writ of mandamus and remanded the matter to the commission with orders to "(1) exercise the discretion afforded to it to determine the appropriate pre-injury visual baseline, and (2) use the updated pre-injury visual

baseline to determine whether the medical evidence supports an award for loss of vision compensation under R.C. 4123.57(B)." *Id.* at ¶ 19.

{¶ 12} The commission has appealed.

## II.  LEGAL ANALYSIS

### A.  Mandamus Standard

{¶ 13} In a direct appeal of a mandamus action originating in a court of appeals, we review the judgment as if the action had been originally filed here. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 164, 228 N.E.2d 631 (1967).   Cogan is entitled to a writ of mandamus if he shows by clear and convincing evidence that he has a clear legal right to the requested relief, that the commission has a clear legal duty to provide it, and that there is no adequate remedy in the ordinary course of the law.  *State ex rel. Zarbana Industries, Inc. v. Indus. Comm.*, 166 Ohio St.3d 216, 2021-Ohio-3669, 184 N.E.3d 81, ¶ 10.  A writ of mandamus may lie when there is a legal basis to compel the commission to perform its clear legal duty under the law or when the commission has abused its discretion in carrying out its duties.  *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 117 Ohio St.3d 480, 2008-Ohio-1593, 884 N.E.2d 1075, ¶ 9.  "When an order [of the commission] is adequately explained and based on some evidence, there is no abuse of discretion and a reviewing court must not disturb the order."  *State ex rel. Aaron's, Inc. v. Ohio Bur. of Workers' Comp.*, 148 Ohio St.3d 34, 2016-Ohio-5011, 68 N.E.3d 757, ¶ 18.

### B.  Scheduled Loss-of-Sight Compensation

{¶ 14} R.C. 4123.57(B) sets forth rates of compensation for the loss or loss of use of listed body parts and functions.  Scheduled-loss compensation payable to an injured worker for loss of sight is authorized as follows:

> For *the loss of the sight of an eye*, one hundred twenty-five weeks.

> For *the permanent partial loss of sight of an eye*, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.

(Emphasis added.) R.C. 4123.57(B).

{¶ 15} "R.C. 4123.57(B) contains two provisions authorizing scheduled loss-of-vision awards: one for the total 'loss of sight of an eye,' regardless of the percentage of vision lost, and another for the 'permanent partial loss of sight of an eye,' which depends on the percentage of vision lost." *Beyer*, 157 Ohio St.3d 316, 2019-Ohio-3714, 136 N.E.3d 454, at ¶ 18; *see also Nastuik*, 145 Ohio St. at 290, 61 N.E.2d 610 (discussing the General Code antecedent and concluding that "compensation for total loss of sight is not dependent upon the percentage of the loss but upon the fact that there was sight which could be lost and was lost completely through the injury"). Thus, an award for total loss of sight may be supported by medical evidence of postinjury vision loss that renders a claimant "legally blind" (i.e., having a corrected visual acuity of 20/200 or less). *Beyer* at ¶ 18; *AutoZone*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, at ¶ 18; *see generally State ex rel. Gen. Elec. Corp. v. Indus. Comm.*, 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588.

{¶ 16} In accord with R.C. 4123.57(B), the standard for assessing *postinjury* vision is the claimant's uncorrected vision. *La-Z-Boy*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545, at ¶ 16, citing *Gen. Elec.* at ¶ 12 and *State ex rel. Kroger Co. v. Stover*, 31 Ohio St.3d 229, 510 N.E.2d 356 (1987). Neither

surgical procedures (e.g., corneal transplants and lens implants) nor optical prostheses (e.g., eyeglasses and contact lenses) may be considered when determining a claimant's postinjury vision. *La-Z-Boy* at ¶ 16, citing *Gen. Elec.* at ¶ 20, *Kroger* at 234, and *AutoZone*.

{¶ 17} R.C. 4123.57 does not address the standard for assessing *preinjury* vision. We have stated that a more flexible approach may be necessary in certain circumstances and that the commission therefore should be afforded some discretion in determining a claimant's preinjury visual baseline. *La-Z-Boy* at ¶ 20. For example, in *La-Z-Boy*, the claimant had a corneal transplant in his left eye before injuring that eye in an industrial accident. Before the corneal transplant, the claimant's left-eye vision was 20/200; after the transplant, it was 20/50; and after the industrial injury, it reverted to 20/200. *Id.* at ¶ 2. We held that the commission did not abuse its discretion in using the claimant's 20/50 posttransplant vision rather than his 20/200 pretransplant vision as the preinjury visual baseline. *Id.* at ¶ 25.

## C. Preinjury Corrections to Vision

{¶ 18} The commission's essential argument on appeal is that Cogan's use of a hard contact lens to correct his preinjury vision is distinguishable from the corneal transplant surgery the claimant underwent in *La-Z-Boy*, 126 Ohio St.3d 134, 2010-Ohio-3215, 931 N.E.2d 545. The Tenth District found no merit to this argument, agreeing with Cogan's view that *La-Z-Boy* is not limited to preinjury surgical corrections. 2022-Ohio-3748, 199 N.E.3d 205, at ¶ 17. The Tenth District held that "even if Cogan cannot demonstrate prior surgical correction to his vision, the commission still has discretion to consider the unique facts of Cogan's visual and medical history." *Id.* We agree.

{¶ 19} First, we have consistently held that there is no legal distinction in this context between surgical procedures and optical prostheses—they are each considered a correction to vision, not a restoration of vision. *La-Z-Boy* at ¶ 16; *Gen. Elec.*, 103 Ohio St.3d 420, 2004-Ohio-5585, 816 N.E.2d 588, at ¶ 51; *Kroger*,

31 Ohio St.3d at 233-234, 510 N.E.2d 356; *see also State ex rel. Baker v. Coast to Coast Manpower, L.L.C.*, 129 Ohio St.3d 138, 2011-Ohio-2721, 950 N.E.2d 924, ¶ 20 (lead opinion). It has been suggested that future medical advancements may justify reclassifying a corneal transplant from corrective to restorative. *E.g.*, *Kroger* at 233-234; *see Gen. Elec.* At ¶ 51; *Baker* at ¶ 25 (Cupp, J., concurring) ("Perhaps an appropriate case will come before the [commission] in which that record can be made, and the commission can evaluate the available evidence on the present state of medical science in this regard"). However, the commission fails to set forth any argument that has not previously been considered and rejected by this court, nor has it cited any record medical evidence that convinces us to overturn the above precedent.

{¶ 20} Moreover, we have not limited application of *La-Z-Boy* to corneal transplants and have not suggested that the presence of surgical correction is determinative in these cases. If one type of correction—a corneal transplant—may be considered when assessing preinjury vision, then another type of correction also may be considered. Of relevance, in *La-Z-Boy*, we said:

> The commission is particularly concerned about situations in which the preinjury correction significantly predates the industrial injury, and we share that concern. Had [the claimant's] corneal transplant occurred in 1985 rather than 2005, for example, he would have had 20/50 vision not for just one, but for 21 years prior to his industrial accident. Under [the employer's] proposal, the appropriate measure of [the claimant's] preinjury vision would be the 20/200 vision that [he] had as a child in 1985, rather than the 20/50 vision that he enjoyed for over two decades. We cannot endorse this result.

Even when preinjury correction does not significantly precede the industrial injury, we can foresee situations in which the appropriate measure of preinjury vision could require a more flexible approach. Perhaps most obvious is a situation in which glasses or contact lenses are used to further correct a surgical correction. In this case, the record is silent as to whether [the claimant] used glasses to correct his preinjury 20/50 vision to 20/20. If he did, his 20/200 vision would seem largely irrelevant since his glasses would have been refracted to correct 20/50 vision, not 20/200. The presence of what effectively are two corrections supports the desirability of affording the commission some discretion in establishing a claimant's preinjury visual baseline.

*Id.* at ¶ 19-20.

{¶ 21} It is undisputed that for over 40 years before his industrial injury rendered him legally blind in his right eye, Cogan had enjoyed 20/40 vision by using a hard contact lens in that eye, and he wore eyeglasses. This is the type of circumstance we foresaw in *La-Z-Boy*: a preinjury correction that significantly predates the industrial injury and the presence of what effectively are two corrections.

{¶ 22} Whether a claimant had preinjury surgical correction is not determinative under R.C. 4123.57 or our caselaw applying it. The commission abused its discretion by using Cogan's uncorrected vision as his preinjury visual baseline merely because the facts of his case did not align exactly with those in *La-Z-Boy*. Cogan has a clear legal right to correct application of the law, which is that, depending on the circumstances of each case, a claimant's preinjury visual baseline may not always be his or her preinjury uncorrected vision.

## III. CONCLUSION

**{¶ 23}** We uphold the Tenth District's conclusion that a writ is appropriate to compel the commission to exercise its discretion, in the first instance, to determine Cogan's preinjury visual baseline and to then use that baseline to determine whether the medical evidence supports an award for total loss of sight under R.C. 4123.57(B). We therefore affirm the Tenth District Court of Appeals' judgment granting a limited writ of mandamus remanding this matter to the commission for further proceedings.

Judgment affirmed.

FISCHER, DEWINE, DONNELLY, STEWART, BRUNNER, and DETERS, JJ., concur.

KENNEDY, C.J., concurs in judgment only.

_____

Spears & Marinakis, L.L.C., and David R. Spears, for appellee.

Dave Yost, Attorney General, and Cindy Albrecht, Assistant Attorney General, for appellant.

_____